UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JOHN DIXON,                             :
                                        :
                Petitioner              :
                                        :
        - against-                      :
                                        :
DAVID L. MILLER, Superintendent,        :
Eastern N.Y. Correctional Facility,     :    MEMORANDUM
                                        :    AND ORDER
                Respondent.             :
                                        :    Civil Action No.
                                        :    CV-03-1611 (DGT)
----------------------------------------X

TRAGER, J.

        This is a pro se petition for a writ of habeas corpus,

pursuant to 28 U.S.C. § 2254, in which petitioner, John Dixon,

raises the following claims: (1) that a showup identification

procedure whose results were admitted at trial was impermissibly

suggestive; (2) that his convictions violated the Fourth

Amendment in that they were based on evidence derived from an

arrest lacking probable cause; (3) that the evidence was

insufficient to support petitioner's convictions for third-degree

assault and second-degree robbery, in that it failed to establish

that petitioner caused physical injury to the complainant by

punching and kicking; (4) that petitioner was denied his right to

be present at a material stage of his trial when he was excluded

from a bench conference regarding a motion to sever his trial

from that of his co-defendants; (5) that petitioner was deprived

his right to testify and his due process right to a fair trial by

the trial court's denial of his application to sever; and (6)
that petitioner was denied effective assistance of counsel.

## Background

### (1)

On March 13, 1998 at 3:40 a.m., a minor traffic accident
escalated into an assault and robbery on Avenue D in Brooklyn.
The victim, Lloyd Samuel, was slashed about the face and head
with a box-cutter.  Samuel identified petitioner as one of his
five attackers at a showup procedure conducted at the hospital
two hours later, immediately following a pair of showup
procedures where Samuel positively identified two other suspects
as two of his other attackers.

The incident began when the rear of Samuel's Ford van was
struck by a Toyota Camry driven by an unidentified young man.
Samuel emerged and observed that there was no damage to the rear
of his van.   Both drivers exchanged polite words.

Samuel then returned to his vehicle, and moved his van a
short distance in order to pick up passengers in front of a night
club.  Samuel was still waiting for one final passenger when he
was approached by five men.  They expressed anger over damage to
the front end of the Camry, which they claimed Samuel had caused.
Samuel was frightened of the men and drove off.

Samuel's passengers, however, did not wish to leave without

their companion and asked Samuel to let them out of the van. Samuel complied, and as he stopped a short distance away from the club, the Camry and another vehicle drove into positions blocking his van. Five men emerged from the two vehicles, and demanded that Samuel pay $150 for the damage to the Camry. Samuels gave them about sixty dollars, which was all the cash he had. Dissatisfied, the assailants kicked and beat Samuel, and one of them repeatedly slashed Samuel's head and face with a box-cutter.

Eventually, Samuel was able to flee his attackers. He then prevailed upon a stranger to use her phone to summon police. Samuel, still bleeding profusely, was transported by police car to a nearby hospital. His wounds required seventy-four stitches and resulted in permanent scars.

A police radio communication went out concerning an assault by three men, one wearing a yellow jacket, who had fled in a tan Camry with front-end damage.[1] Police Officer William Van Pelt responded to this communication and began canvassing the area in an unmarked car. At 5 a.m., Van Pelt saw a tan Camry with front-end damage parked on the corner of Nostrand Avenue and Prospect Place. As he watched, Van Pelt saw Cedrick Boswell leave the front passenger seat, and then later saw James Walker enter the front driver's seat. Van Pelt then approached and began to question Walker concerning the car. As he was being questioned,

---

[1]It is unclear whether Samuel or some other witness was the source for this information.

Walker got out of the car and surreptitiously attempted to drop a box-cutter. Van Pelt noticed the box-cutter drop and retrieved it. Meanwhile petitioner, wearing a yellow jacket, approached from across the street. Petitioner explained to Van Pelt that the car belonged to petitioner's girlfriend and that petitioner had the paperwork. Walker, Boswell and petitioner were then detained pending the arrival of Henry Campbell who was supposed to have witnessed a portion of the earlier incident. When Campbell arrived, he told Van Pelt that he recognized the car and the three suspects as those he had seen in the earlier incident. Van Pelt then placed Walker, Boswell and petitioner under arrest.

Later that morning, after the three men had been booked at the precinct, Van Pelt conducted a showup identification procedure at the hospital where Samuel was being treated, wherein Walker, Boswell and petitioner, in succession and in that order, were led before Samuel. As soon as they were led before him, Samuel identified each as one of his assailants, and identified Walker as the man who used the box-cutter.

(2)

Petitioner, Walker and Boswell were charged, by a Kings County Grand Jury, under an acting-in-concert theory, with Assault in the First Degree (N.Y. Penal Law § 120.10(2)), two counts of Assault in the Second Degree (N.Y. Penal Law § 120.05(2), (6)), Assault in the Third Degree (N.Y. Penal Law § 120.00(1)), Robbery in the First Degree (N.Y. Penal Law

4

§ 160.15(3)), two counts of Robbery in the Second Degree (N.Y. Penal Law § 160.15(1), (2)(a)), Robbery in the Third Degree (N.Y. Penal Law § 160.05), and Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 265.01(2)).

Before trial, petitioner's counsel moved to suppress the box-cutter as the fruit of an arrest made without probable cause, and to suppress Campbell's and Samuel's identifications as the consequence of unduly suggestive showup procedures.  Officer Van Pelt testified at the hearing concerning both the detention and arrest of petitioner and the showup at the hospital.  The court found that Officer Van Pelt had probable cause for the arrest on the basis of all the circumstances, including Campbell's identification of petitioner and his co-defendants.  The court also found that the showup procedures were not unduly suggestive.

A joint trial of Walker, Boswell and petitioner began on May 11, 1999.  Samuel testified regarding the attack itself, and identified all three defendants as being among his five attackers.  He testified that a man in a yellow jacket punched him in the ribs, that a man in a black jacket slapped his face, and that Walker, who wore a maroon jacket,[2] cut him with the box-cutter.  All five then jumped him and began beating and kicking him.

Officer Van Pelt testified regarding the detention and

_____

[2]At the time of his arrest, Walker actually wore a black jacket.

5

arrest of all three defendants, and regarding the showup procedures at the hospital. The box-cutter recovered from Walker was admitted into evidence at this time, as were petitioner's yellow polo jacket and the jackets worn by Walker and Boswell.

Campbell testified that he had seen the traffic accident between the van and the Camry, and the later argument that occurred in front of the club between Samuel and three or four other men, but that he had not observed the assault itself. Regarding the showup at Nostrand Avenue, Campbell testified that he had not recognized any faces, but only their jackets.

At the close of the prosecutor's case,[3] petitioner's counsel moved to sever petitioner's trial from that of his co-defendents, indicating that petitioner's decision to testify might depend upon this ruling. When the motion for severance was denied, petitioner decided not to testify, and presented no evidence on his own behalf. Boswell, petitioner's co-defendant, then called Police Officer Andre Cramden who testified that Samuel had stated he had backed into the Camry.

The jury convicted petitioner of Robbery in the Second Degree (N.Y. Penal Law § 160.10(2)(A)) and Assault in the Third Degree (N.Y. Penal Law § 120.00(2)).

---

[3]Other witnesses for the prosecution included a DNA expert who testified that a speck of blood on the box-cutter was consistent with that of the victim, a man who witnessed part of the actual assault but made no identifications, and the police officer who transported the victim to the hospital.

Prior to sentencing, petitioner moved <u>pro se</u>, pursuant to Crim. Proc. Law § 330.30,[4] to vacate his judgment of conviction on the ground that he was legally blind and that this constituted newly discovered evidence. The court denied the motion. On June 17, 1999, the court sentenced petitioner to concurrent terms of three and one-half to seven years on the robbery conviction, and one year on the assault conviction.

On December 8, 1999, petitioner moved <u>pro se</u>, pursuant to Crim. Proc. Law § 440.10, to set aside the conviction on the ground that his trial counsel was ineffective for having failed to develop and present a defense based on petitioner's legal blindness and for having refused to permit petitioner to testify. On April 14, 2000, the trial court denied petitioner's motion, holding that petitioner had received meaningful representation. Petitioner applied to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division") for leave to appeal the denial of his motion. On September 12, 2000, the Appellate Division denied petitioner's application for leave to appeal.

Petitioner then appealed his conviction to the Appellate Division. In his brief, petitioner raised the following claims: (1) that the box-cutter and identifications should have been

---

[4]Petitioner actually invoked N.Y. Crim. Proc. Law § 440.10, which was premature, as petitioner had not yet been sentenced. The court treated it as a motion pursuant to § 330.30.

suppressed as the fruit of an arrest made without probable cause; (2) that the trial identification of petitioner should have been suppressed as the fruit of an unduly suggestive identification procedure; (3) that the trial court should have re-opened the probable-cause hearing <u>sua</u> <u>sponte</u> when Campbell testified at trial; (4) that the evidence was insufficient to prove that petitioner "caused physical injury by punching and kicking" as required for both convictions; (5) that petitioner was denied the right to be present at a material stage of his trial; (6) that petitioner's application to sever the trial at the close of the prosecution's case should have been granted; and (7) that the court should have granted petitioner a hearing on whether to set aside the verdict based on ineffective assistance of counsel.

On October 7, 2002, the Appellate Division unanimously affirmed petitioner's judgment of conviction. <u>People v. Dixon</u>, 298 A.D.2d 400, 751 N.Y.S.2d 232 (2d Dep't 2002). The Appellate Division held that there was probable cause for petitioner's arrest and thus, the trial court had properly denied petitioner's suppression motion. The Appellate Division also held that petitioner's legal sufficiency claim was unpreserved, and in any event without merit, and in particular cited the slash wounds with the box-cutter in support of the element of physical injury. Petitioner's remaining claims were found to be either "unpreserved for appellate review or without merit." <u>Id.</u>

Petitioner applied to the New York Court of Appeals for leave to appeal the Appellate Division's affirmance of his conviction.  In his application, petitioner specifically sought to appeal his claim that he was denied the right to be present at a material stage of his trial, and his claim that the identification should have been suppressed as the product of an unduly suggestive showup, but also incorporated by reference all other issues from his appellate brief.  On December 31, 2002, the Court of Appeals denied petitioner's application for leave to appeal.  <u>People v. Dixon</u>, 99 N.Y.2d 557, 754 N.Y.S.2d 209 (2002).

## Discussion

Petitioner's current <u>habeas</u> <u>corpus</u> petition raises substantially the same claims he raised in his brief to the Appellate Division.  These claims are as follows: first, that the showup was unduly suggestive; second, that certain evidence should have been suppressed as fruit of an arrest lacking probable cause; third, that the evidence was legally insufficient to prove that petitioner caused physical injury by punching and kicking; fourth, that petitioner was denied the right to be present at a material stage of his trial; fifth, that the court's denial of his application to sever the trial denied him due process and his right to testify; sixth, that petitioner was denied effective assistance of trial counsel.  These claims will

be addressed in the order listed.

(1)

Petitioner's first claim is that the showup was unduly suggestive and that certain testimony relating to identification should therefore have been suppressed.

Independent and Adequate State Grounds

Respondent argues that the Appellate Division denied petitioner's claim as unpreserved under state law, thereby barring federal review of the merits. Whether in the context of a <u>habeas</u> proceeding or on direct review, a federal court may not review a question of federal law decided by a state court where the state decision rests on a state ground that is both independent of the federal question and adequate to support the judgment. <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991); <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989); <u>Wainwright v Sykes</u>, 433 U.S. 72, 81 (1977). There is a conclusive presumption of federal jurisdiction unless the state court clearly and expressly relies on independent state grounds. <u>See</u> <u>Coleman</u>, 501 U.S. at 733; <u>Harris</u>, 489 U.S. at 263; <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983). New York's variant of the rule that a contemporaneous objection is required to preserve claims for appellate review, N.Y. Crim Proc. Law § 470.05(2), would ordinarily qualify as such a ground. <u>See</u> <u>Garcia v. Lewis</u>, 188 F.3d 71, 78-79 (2d Cir. 1999). When a state court uses language such as "the defendant's

10

remaining contentions are either unpreserved for appellate review or without merit," the claim is treated as preserved and subject to federal review. <u>Fama v. Comm'r of Corr. Svcs.</u>, 235 F.3d 804, 810 (2d Cir. 2000); <u>see also</u> <u>DeBerry v. Portuondo</u>, 402 F.3d 57, 64 (2d Cir. 2005). Petitioner's challenge to the showup is among those "remaining contentions" that the Appellate Division rejected as "either unpreserved ... or without merit." <u>Dixon</u>, 298 A.D.2d at 400; 751 N.Y.S.2d at 232. <u>Fama</u>, therefore, dictates that the claim be treated as preserved.

Respondent, nonetheless, argues that this claim must be the "unpreserved" claim, because no other remaining claims were argued to be unpreserved in the Respondent's Brief to the Appellate Division. <u>Fama</u> appears to preclude accepting this argument and respondent cites no compelling authority supporting this argument.

In any event, a review of the record, cannot support the contention that this claim is entirely unpreserved. Petitioner challenged the showup as unduly suggestive in a pre-trial motion and argued that it was unduly suggestive at the close of the resulting hearing. The claim was then raised on appeal in petitioner's brief to the Appellate Division. Finally, it was one of the two issues specifically mentioned as meriting review in petitioner's application to the Court of Appeals, so to the extent that it is preserved, it must also be considered

11

exhausted.

In the Respondent's Brief to the Appellate Division, the argument for non-preservation was based on the fact that one of the factors emphasized in petitioner's brief was that petitioner was brought before Samuel while still wearing his distinctive yellow jacket. This specific point, however, was never argued before the hearing court below and was not reflected in the hearing court's findings of fact; it is, therefore, at least debatable whether the fact was unambiguously established during the course of the hearing itself. However, petitioner also specifically argued, in his brief to the Appellate Division, that the showup was unduly suggestive even if the distinctive yellow jacket was not considered, and proceeded to make specific reference to the arguments made by petitioner to the court below. Petitioner's argument is, therefore, preserved at least to the extent that it does not rely on this factor.

## Deference under the AEDPA

Respondent argues that even if the claim was preserved, the Appellate Division must have rejected it on the merits, and its decision is, therefore, due the deference mandated under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See 28 U.S.C. § 2254(d). Respondent's other argument that the Appellate Division must have rejected petitioner's claim as unpreserved weighs against this argument.

Where "it cannot be determined from the state-court opinion whether the denial of a given claim was based on a procedural ground rather than on the merits, no AEDPA deference is due to the state court decision on that claim." <u>See</u> <u>Rudenko v. Costello</u>, 286 F.3d 51, 69 (2d Cir. 2002). Generally, this rule applies where the claim in question is among those listed in the state court decision as "unpreserved or without merit." <u>See</u> <u>Miranda v. Bennett</u>, 322 F.3d 171, 178 (2d Cir. 2003). "If the record makes clear, however, that a given claim had been properly preserved for appellate review, we will presume that it fell within the 'without merit' disjunct even if it was not expressly discussed by the Appellate Division." <u>Id.</u> In the instant case, the record clearly indicates that petitioner's claim was preserved to at least some extent. Therefore, one must presume that the Appellate Division decided petitioner's case on the merits to that same extent.

In any event, an adjudication of the issue, on the merits, was conducted by the hearing court. It is not clear whether an adjudication on the merits by a lower state court, which is neither explicitly affirmed on the merits nor explicitly rejected by the appellate court, is sufficient to trigger AEDPA review. <u>See</u> <u>DeBerry</u>, 403 F.3d at 68 (expressly declining to decide the question). However, there is nothing in the language of the statute that suggests that AEDPA deference is due only when the

13

merits of an issue are addressed by an appellate court. It only requires that a claim be "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Logically, a lower court ruling should suffice, provided there is nothing in higher court proceedings to suggest a disavowal on behalf of the state. In deference to the plain language of the statute, or, alternatively, on the authority of <u>Miranda v. Bennett</u>, the decision of the hearing court will, therefore, be reviewed under the AEDPA deference standard.

<u>The Hearing Court's Findings of Fact</u>

The hearing court made detailed findings of fact based exclusively on the testimony of Officer Van Pelt. <u>See</u> Resp't's Ex. A, 188-94. There appear to be no grounds for holding them to be unreasonable under 28 U.S.C. § 2254(d)(1). Nor has petitioner rebutted the presumption of correctness for a state court's factual findings by clear and convincing evidence as required under § 2254(e)(1).[5] Therefore, these factual findings are adopted here.

The hearing court found that Officer Van Pelt had received, at about 4 a.m., a series of radio calls initially reporting an knife assault in progress, then reporting that three male

---

[5]This latter consideration operates regardless of whether there was an adjudication on the merits under § 2254(d). The merits determination requirement only applies to § 2254(d) and not to § 2254(e).

perpetrators, one with a yellow jacket, fled in a tan Toyota
Camry with front-end damage.  At about 5 a.m., while canvassing
the indicated area, Van Pelt saw a beige Camry parked near an
intersection.  Van Pelt first saw Boswell leave the car's front
passenger seat, then saw Walker enter the car's front driver's
seat.  Van Pelt began to question Walker concerning the car, and
Walker indicated that it was his friend's car.  At this point,
Walker gestured across the street in the direction of petitioner.
Van Pelt looked briefly in the direction of petitioner, but as he
looked back he saw Walker (who by this time had left the car),
drop a box-cutter on the ground.  Van Pelt retrieved the box-
cutter.  Meanwhile, petitioner approached and stated that the car
belonged to his girlfriend.

By this time Van Pelt had heard, based on police radio
broadcasts, that the victim had been taken to the hospital, but
that another witness was available.  Van Pelt instructed the
three defendants to remain at the scene pending the arrival of
this witness, Harry Campbell.  Ten minutes later, Campbell
arrived and told Van Pelt that the Camry at the scene was the car
he had seen involved in the accident, and that the three
defendants were the men he had seen in an argument which followed
the accident.  Van Pelt then arrested petitioner, Walker, and
Boswell.

Petitioner and his two co-defendants were then taken to the

69th precinct, where they were logged in and searched. One hundred twenty-seven dollars in cash was found on Walker, and forty-two dollars was found on petitioner. Their jackets and some other items of clothing were vouchered, as was the box-cutter.

Van Pelt then transported petitioner and his co-defendants to Brookdale Hospital, where Samuel was being treated in the emergency room. Van Pelt first spoke to Samuel, who told Van Pelt he had been attacked with a knife and a gun. At the time Van Pelt spoke to Samuel, before the showups, Samuel's treatment, consisting mainly of stitches to his wounds, appeared to be largely complete. A police officer then led the three defendants, separately and one at a time, in front of a 15-by-15 inch window through which Samuel was able to observe them.

Walker was the first person displayed before the window. Samuel identified Walker as one of his attackers and indicated that Walker had punched him and cut him with a box-cutter. Boswell was the second person displayed and was also identified as an attacker. Samuel said that Boswell had punched him and at one point had gone to the car and returned with a gun. Finally, petitioner was displayed. Samuel also identified petitioner as one of his attackers. Samuel said that petitioner had punched him, cut him and had a loud mouth.

### The Hearing Court's Findings of Law

16

On the basis of these facts, the hearing court ruled that the showups "were not unduly suggestive," "did not create a significant risk of any misidentification error," and were consistent with the rule that such a procedure "is permissible if close enough in time and place" to the events giving rise to the charges.[6]  Resp't's Ex. A at 197-98.  The court cited New York case law upholding showups that occurred two to three hours after the alleged crime, and concluded that the time lapse at issue "was not beyond the standards that have been countenanced." Resp't's Ex. A at 198 (citing People v. McBride, 242 A.D.2d 482, 662 N.Y.S.2d 470 (1st Dep't 1997); People v. Wells, 221 A.D.2d 281, 634 N.Y.S.2d 462 (1st Dep't 1995), People v. Rhynes, 124 A.D.2d 1038, 508 N.Y.S.2d 759 (4th Dep't 1986)).

The hearing court further held that "there is evidence of exigent circumstances with the conflicting reports concerning the condition of the complainant at the hospital," and therefore sufficient grounds to seek identification in the interest of either exonerating the defendants, or resuming the pursuit of the culprits.  The court ruled that each of the identification

_____

[6]The hearing court's findings of fact, summarized above, contain no precise information as to the time of the showups. However, at the hearing, Van Pelt testified that when he spoke to Samuel just prior to the showups, it was approximately 6 o'clock. Resp't's Ex. A at 22.  Since no contrary information was presented, the court's conclusions regarding timing were presumably based on this testimony, which places the showup with Samuel about two hours after the crime, and the hospital showup at some point shortly thereafter.

procedures, and their results, were admissible in evidence.

<u>Analysis</u>

Under the AEDPA, the hearing court's decision may be overturned only if it was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1); <u>Williams v. Taylor</u>, 539 U.S. 363, 412-13 (2000).

The "unreasonable application" clause will be addressed first.  Under the "unreasonable application" clause, the writ may be granted only if the state court identifies the correct governing legal principle from Supreme Court decisions, but unreasonably applies that principle to the facts of the petitioner's case.  <u>Williams</u>, 439 U.S. at 413.  Only the actual holdings, and not the dicta, of the Supreme Court are considered. <u>McKinney v. Artuz</u>, 326 F.3d 87, 96 (2d Cir. 2003).

The Supreme Court has held that an identification procedure may be "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny due process of law.  <u>Stovall v. Denno</u>, 388 U.S. 293 (1967).  A court must assess the "totality of the circumstance" to determine whether such a violation in fact occurred.  <u>Id.</u>  "[E]ach case must be considered on its own facts," to determine whether the challenged identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

18

<u>Neil v. Biggers</u>, 409 U.S. 188, 196-97 (1972) (citing <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968)).  Exigent circumstances may justify an otherwise suggestive identification procedure. <u>See</u> <u>Stovall</u>, 388 U.S. at 295.  A later case, however, focused on "reliability" as the "lynchpin" of the test.  <u>See</u> <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977).  The factors to be considered include:  (1) the opportunity to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.  <u>Id.</u>  Against these factors is to be weighed the corrupting influence of the suggestive identification itself.  <u>Id.</u>

In <u>Foster v. California</u>, 394 U.S. 440 (1969) the Supreme Court held, for the first and last time, that an identification procedure failed the "totality of circumstances" test from <u>Stovall</u>.  There, the witness initially failed to make a positive identification of the suspect, even though the lineup was highly suggestive in that there were only two fillers (both much shorter than the suspect) and the suspect was the only participant wearing a leather jacket similar to that worn by one of the robbers.  The witness remained unsure even after he requested, and was granted, a one-on-one confrontation with the suspect. The witness ultimately did make a positive identification a week

to ten days later, after he again viewed the suspect in a lineup, this time with four fillers. Id. at 442-42. "The suggestive elements of this identification made it all but inevitable that David would identify petitioner whether or not he was, in fact, 'the man'." Id. at 443.

With respect to the showup in front of the witness Campbell at Nostrand Avenue, it cannot be said that the finding was unreasonable in light of precedent. That showup occurred between one and two hours after the incident in question. Campbell had no stake in the outcome of the showup. Furthermore, Campbell's attention was not explicitly directed towards any specific person; rather he was merely asked if he recognized anyone at the scene. Although the showup arguably had suggestive aspects,[7] the hearing court reasonably could have concluded, consistent with Supreme Court case-law, that it was acceptable to allow these factors to be weighed by the jury - that they went to weight, not admissibility. Moreover, Campbell testified at trial that he only saw the argument in front of the club rather than the assault that occurred at a slightly different place and slightly

---

[7]In particular, there was danger that petitioner would be identified merely because he was wearing a yellow jacket, standing near a vehicle used in the crime and in the company of probable culprits. Indeed, according to Campbell's trial testimony, this is more-or-less what did occur, though Campbell's awareness of the process and candor on the stand tend to negate any prejudice to petitioner. Petitioner's yellow jacket and his admitted connection to the vehicle were strong evidence against him.

later time, and that he did not recognize the defendants by their faces, but only by their car and their clothing. Since he did not in fact testify at trial that he identified petitioner in a meaningful way, any error in ruling that his anticipated identification would be admissible was harmless.

The showup at the hospital is a little more troubling. Setting aside, for the moment, the question of whether the showup violated due process, the circumstances raise questions about its reliability. Samuel was accosted, at night, by five persons and gave a vague description of his attackers prior to the showups. There is no independent evidence that he had an adequate look at petitioner. Nothing on the record establishes that he was able, for instance, to describe the two attackers who were not brought before him - and yet he was able to identify with complete confidence the three that were. Moreover, the individual showup of petitioner was itself suggestive, in that petitioner was clearly in custody when he was brought before the victim. In contrast to the Nostrand Avenue encounter with Campbell, here the circumstances implied that petitioner and his co-defendants would not have been brought before the witness unless the police already had an independent reason to believe that they were the culprits.

Even considering these factors, the showup procedure did not violate petitioner's due process. These circumstances alone do

not make the encounter any more suggestive than that which the
Supreme Court upheld in Stovall, where police escorted the
suspect, in handcuffs, to the victim's hospital bed and asked,
"is this the man?"  Of course, the Stovall court appeared to rely
on exigent circumstances which were far more compelling.
However, this distinction may have less importance than Stovall
implied, in light of later rulings that reliability (and hence,
not exigency) is the "linchpin" of such due process claims.  See
Manson, 432 U.S. at 114.  Stovall never explicitly held that
there would have been a denial of due process absent the exigent
circumstances discussed.

    The above considerations do not render the decision of the
hearing court unreasonable in light of Supreme Court precedent.
The relevant question is not whether the identification was, in
many respects, flawed, for such questions regarding weight of
evidence are normally left to the jury.  The hearing court
expressly supported its finding by citing the relatively brief
time between the incident and the confrontation, which is one of
the factors explicitly endorsed by the Supreme Court.  Whether or
not the witness's strong level of certainty should be a
significant factor in determining reliability, there is no
question that, in stark contrast to the initial confrontation in
Foster, the witness here expressed certainty that petitioner was
one of his attackers from the first time he saw him, which was

still within a few hours of the attack.  The witness's
opportunity to view the criminal was not ideal, but neither was
it negligible.  The absence of a prior description by Samuel is
the only factor that clearly weighs in petitioner's favor here,
and even that should perhaps be given little weight, since there
had not been, as yet, much of an opportunity for Samuel to
provide one.

As to the "corrupting influence of the identification
procedure itself," against which the above factors are to be
weighed, arguably, the hearing court ought to have given more
weight to the possible influence of the fact that petitioner's
showup occurred <u>immediately after</u> the positive identifications of
two other suspects, under circumstances that clearly implied the
three had been arrested together.  This factor was not present in
<u>Stovall</u>.  Arguably, such a situation could create a danger that
petitioner, even if innocent, might be identified due to a
perceived association with persons actually recognized as
culprits.  However, there is nothing in the record that indicates
Campbell ever made this inference.[8]

Petitioner faces a very heavy burden when challenging a
decision as an unreasonable application of the "totality of

_____

[8] Although not argued in state courts, that this aspect of
the situation can not be discounted entirely.  A "totality of
circumstances" test, by its very nature, requires that all
circumstances be considered, and it is fair to include anything
established in the hearing court's findings of fact.

circumstances" test, which by its nature requires case-by-case analysis.  No matter how flawed or suggestive an identification procedure is, it is difficult to find a point where it would become clear to any reasonable jurist that the evidentiary value of that identification should be decided by a judge serving his gate-keeping function rather than by a jury as weigher of the evidence.  No doubt, one could imagine cases where the identification was so corrupt and unreliable that no reasonable jurist could conclude that it was more reliable or less suggestive than the identification procedure rejected by the Supreme Court in <u>Foster</u>.  However, the fact pattern at issue here does not present such a case, and it cannot be said that the decision of the hearing court was an unreasonable application of clearly established Supreme Court holdings.

Since full deference has been given to the hearing court's factual findings, no consideration is given to the claim that the hospital showup was unduly suggestive because petitioner was still wearing his yellow jacket.  No such information was presented at the hearing, and the hearing court made no findings of fact relating to this claim.[9]

---

[9]Indeed, the only relevant testimony presented at the hearing was that all jackets were "vouchered" at the police station prior to the hospital showup, which would seem to suggest that petitioner was <u>not</u> wearing his jacket at the hospital.
It is possible that the Appellate Division rejected petitioner's claim as "unpreserved" to the extent that petitioner relied on this argument.  However, there is no need to determine

The next issue is whether the decision was "contrary to" Supreme Court precedent. Under the "contrary to" clause, relief may be available where either (1) the state court arrives at a conclusion opposite that of the Supreme Court on a question of law, or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. Williams, 539 U.S. at 412-13. With respect to the first alternative, there is no indication that either the Appellate Division or the hearing court below articulated standards of law inconsistent with prior Supreme Court holdings.[10] With respect to the second alternative, Foster is the only case wherein the Supreme Court's decision has been "opposite" on this precise legal question. The facts of petitioner's case can in no sense

---

whether the Appellate Division rejected this part of the argument in reliance on an "independent and adequate state ground." It suffices that this claim was presented "for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor," and has, therefore, not been properly exhausted. See Castille v. Peoples, 489 U.S. 346, 351 (1989). Since petitioner has no further avenue for raising this aspect of the claim, it is deemed exhausted, but procedurally barred.

[10]The Appellate Division's decision did not contain any restatement of the relevant legal standards.
The hearing court, quite properly, addressed itself primarily to the question of whether the showups "created a significant risk of any misidentification error" given "all the other overall circumstances" Resp't's Ex. A at 197-98, and gave secondary consideration to the question of exigency, Id. at 198-99. This seems an adequate restatement of the correct standard, and, at any rate, is at least not inconsistent with that standard.

be considered "materially indistinguishable" from those in
Foster.  Therefore, the "contrary to" clause has no applicability
here.

Petitioner's first claim is, therefore, rejected.

(2)

Petitioner's second claim, that his convictions were based
on evidence derived from an arrest lacking probable cause, arises
under the Fourth Amendment's guarantee against unreasonable
search and seizure.  A federal habeas court is barred from
reviewing a claim under the Fourth Amendment so long as the state
provides an opportunity for full and fair litigation of such
claim.  Stone v. Powell, 428 U.S. 465 (1976).  Petitioner can
claim denial of such opportunity only where the state has
provided no corrective measures to address such violations, or
where petitioner was precluded in using the corrective measures
provided because of an unconscionable breakdown of the underlying
process.  Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1977);
Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977).

It is settled law that New York statutes provide an adequate
corrective mechanism.  Gates, 568 F.2d at 840.  Petitioner,
therefore, can only claim relief if there was an unconscionable
breakdown in the underlying process.  No such unconscionable
breakdown is apparent here.  Petitioner was granted a hearing
wherein his counsel raised and argued the issue of probable

cause. The arresting officer testified as to the circumstances of petitioner's arrest and the trial court made findings on this basis. These findings were reviewed and affirmed by the Appellate Division. Allegations that information presented at the hearing were subsequently proved to be inaccurate are inadequate to establish an unconscionable breakdown in the process itself. Accordingly, petitioner's second claim is rejected.

(3)

Petitioner's third claim is that the evidence was legally insufficient at trial to prove his guilt as to either of the two charges of which he was convicted. Specifically, petitioner argues that the prosecutor failed to prove that petitioner caused "physical injury" (as defined by statute) to the victim by punching and kicking.

Under the Due Process Clause of the United States Constitution, a person may not be convicted of any crime unless the prosecution proves beyond a reasonable doubt each fact necessary to constitute the offense with which he is charged. In re Winship, 397 U.S. 358, 361-62 (1970). When a federal court reviews state convictions challenged on habeas review, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319

(1979).  A petitioner bears a "very heavy burden" when

challenging the legal sufficiency of the evidence in a state

criminal conviction.  Einaugler v. Supreme Court, 109 F.3d 836,

840 (2d Cir. 1997).  The federal court must look to state law to

determine the essential elements of the crime.

Petitioner's claims of legal insufficiency appear to be most

specifically directed to his conviction for Assault in the Third

Degree.  Petitioner, however, received only a concurrent sentence

of one year for this charge, which he had already completed in

March 12, 2003, at the time his current petition was filed.

Therefore, he was no longer in custody on this charge, and this

Court has no jurisdiction to grant habeas relief with respect to

this particular conviction.  See, e.g., Maleng v. Cook, 490 U.S.

488, 492 (1989) (once sentence under conviction fully and

unconditionally expires, federal courts have no jurisdiction over

petitions filed thereafter).

However, petitioner also challenges his sentence for Robbery

in the Second Degree, over which this court does have

jurisdiction.  With respect to this conviction, New York state

law dictates that "[a] person is guilty of Robbery in the Second

Degree when he forcibly steals property and when in the course of

the commission of the crime or in immediate flight therefrom he

or another participant of the crime causes physical injury to any

person who is not a participant of the crime." Trial Tr. at 701;
N.Y. Penal Law § 160(2)(A); see also N.Y. Penal Law § 20.00
(defining law of accomplice liability); N.Y. Penal Law § 10.00(9)
(defining "physical injury" as "impairment of physical condition
or substantial pain").

Viewed in the light most favorable to the prosecution, the
evidence was sufficient to permit the jury to conclude that
petitioner acted in concert with Walker and others to force
Samuel to surrender cash. The jury was further entitled to
conclude that Walker, another participant of the crime, inflicted
physical injury on Samuel. Contrary to petitioner's contentions,
this crime did not require, even as charged to the jury, that the
"physical injury" must be inflicted only by punching and
kicking.[11] See Trial Tr. at 701-703. It was, therefore,
permissible, with respect to this element, for the jury to
consider those injuries that Walker inflicted to the victim's
face by means of a box-cutter. Unquestionably, the evidence was
sufficient to permit a rational jury to conclude that these
injuries caused "substantial pain," not to mention "impairment of
physical condition" in the form of substantial blood loss and
permanent scarring.

---

[11]This argument might have more relevance to petitioner's
conviction for Assault in the Third Degree, which was charged as
a separate crime from the face-slashing, and, as charged to the
jury, specified that the required "physical injury" was inflicted
by punching and kicking.

Petitioner's claim of legal insufficiency of his robbery conviction is, therefore, meritless. This court has no jurisdiction over his assault conviction.

(4)

Petitioner also claims that he was denied his right to be present at a material stage of his trial when he was excluded from a bench conference regarding a motion to sever his trial from that of his co-defendants. Since this is among the claims rejected by the Appellate Division as "either unpreserved ... or without merit," it will be assumed, for purposes of this opinion, that no AEDPA deference is required.

A criminal defendant has a right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." Faretta v. California, 422 U.S. 806, 819 n.5 (1975). However, "the right to be present is not absolute: it is triggered only when the defendant's presence has a relation, reasonably substantial, to the fulness [sic] of his opportunity to defend against the charge." Cohen v. Senkowski, 290 F.3d 485, 489 (2d Cir. 2002) (quoting Snyder v. Massachussetts, 291 U.S. 97, 105-106 (1934)). A defendant has a due process right to be present "to the extent that a fair and just hearing would be thwarted by his absence and to that extent only." Snyder, 291 U.S. at 108.

The challenged exchange occurred after the close of the

30

prosecution's case.  See Trial Tr. at 553-61.  At the request of
petitioner's counsel, it was held only in the presence of
attorneys and out of presence of the three defendants (including
petitioner).  Id. at 553.  Petitioner's counsel then represented
to the trial court that petitioner had planned to testify, that
he was totally blind in one eye, and almost blind in the other.
However, petitioner had represented to his counsel that morning
that his safety had been threatened by unnamed persons - who were
not his co-defendants - who had sought to dissuade him from
testifying.  Because of these threats, petitioner would be
dissuaded from testifying on his own behalf.  He claimed a
severed trial would solve this problem.[12]  He suggested that the
court question petitioner about the threats in camera and out of
the presence of co-defendants or co-counsel.  The trial court
rejected the severance motion as untimely, stating that such
motions must be made "in advance of trial," because otherwise
"otherwise every co-defendant case could be subject to the same
resolution" - that it must be "severed after the People rest
because we have just discovered that a defendant wants to testify

---

[12]Although petitioner's counsel never made his logic
explicit, presumably this would be because, in a severed trial,
there would be no conflict between petitioner's desire to testify
in his own behalf and his desire - supposedly induced by threat -
to avoid giving testimony adverse to his co-defendants.
Petitioner's counsel had suggested, as an alternate solution to
the problem, that the prosecutor agree not to cross-examine
petitioner with respect to his co-defendants, but the prosecutor
refused.  See Trial Tr. at 559.

31

in a fashion that's antagonistic to another defendant." _Id._ at
560-61.

It would not ordinarily be appropriate to characterize a
severance motion premised on threats to a defendant as the sort
of purely legal matter where a defendant's presence might not be
essential.  Had petitioner's motion been timely, it may be
assumed that, in any hearing where threats to a defendant might
be relevant to the outcome of such a motion, such defendant's
direct knowledge of such threats would make his presence
indispensable to the fullness of his opportunity to defend
against charges against him.

However, the question before the court in the proceeding at
issue here might more appropriately be characterized as a
question of timeliness.  The court rejected the claim as
untimely, claiming that counsel ought to have anticipated the
problems described.  The court entertained arguments of
petitioner's counsel only to the extent necessary to determine if
there might be some extraordinary basis for entertaining an
untimely severance motion.  In refusing ultimately to entertain
the motion, the court based its decision on reasons of policy
that made no assumptions about the truth of petitioner's specific
factual claims.  It is difficult to see how petitioner's presence
could have altered this outcome in any way, especially if
petitioner's counsel were correct to suggest that petitioner

would be willing to speak to the court only if counsel for co-defendants were excluded.[13]

Moreover, petitioner's claim is subject to harmless error analysis.  See United States v. Feliciano, 223 F.3d 102, 111-112 (2d Cir. 2000).  Even if petitioner's rights were violated by his exclusion at this stage, such error would have to be deemed harmless, since petitioner cannot demonstrate that the error "had substantial and injurious effect or influence in determining the jury's verdict."  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Petitioner has not suggested any way that his presence could have altered the outcome of the proceeding or of the remainder of the trial.  The court's decision was based upon broad reasons of policy and declined to consider the truth or falsehood of anything petitioner might have had to say about either the threats or his blindness.

Therefore, petitioner's claim for relief on the basis of the denial of his right to be present at his trial is also rejected.

(5)

Petitioner also alleges that, by refusing his request for severance on the basis of threats made against him, the court effectively prevented petitioner from testifying in his own

_____

[13]It is worth noting that it was petitioner's counsel who requested that all co-defendants, including petitioner, be excluded from the bench conference, ostensibly to protect petitioner from the threat of retaliation for initiating this motion.

behalf and deprived him of a fair trial. Petitioner argues that this alleged deprivation thereby violated the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. These claims have no merit. Even assuming, _arguendo_, that it may be possible for denial of a severance motion to result in a violation of certain constitutional rights, it can hardly be claimed that it is unconstitutional for New York state to insist that motions for severance of trial ordinarily be made before the trial actually begins, rather than at the close of the prosecutor's case.

(6)

Finally, petitioner alleges ineffective assistance of trial counsel, on the basis of trial counsel's failure to introduce evidence at trial that petitioner was totally blind in one eye and has seriously impaired vision in the other. In order to establish a claim of ineffective assistance of counsel on a writ of _habeas corpus_, a petitioner must show both that his counsel provided deficient representation and that petitioner suffered prejudice as a result of that performance. _Strickland v. Washington_, 466 U.S. 668, 687-88 (1984).

Petitioner's claim cannot succeed because he cannot meet the second prong of this standard. "Blindness" is not a defense, in itself, to a charge of Robbery in the Second Degree, and

34

petitioner has failed to explain how this information is relevant as an evidentiary matter.  There has been no showing that his eyesight was so deficient as would render him incapable of the acts of punching and kicking that the victim claimed petitioner performed.  It is likewise difficult to imagine how petitioner's partial blindness would be relevant to disproving the required mental state for Robbery in the Second Degree – intent to steal property by force.  Petitioner's sense of hearing should have been entirely sufficient to inform him why he and his friends were beating Mr. Samuel.

## Conclusion

For these reasons, petitioner's application for a writ of habeas corpus is dismissed. Further, as the petition presents no questions of substance for appellate review, a certificate of appealability is denied. The Clerk of Court is directed to enter judgment and close the case.


Dated:      Brooklyn, New York
            November  , 2005

                                        SO ORDERED


                                        _____/s/_____
                                        _____
                                        David G. Trager
                                        United States District Judge

SENT TO:

John Dixon
99-A-3616
Eastern Correctional Facility
PO Box 338
Napanoch, NY 12458

Anne C. Feigus
Office of Charles J. Hynes
Kings County District Attorney
350 Jay Street
Brooklyn, NY 11201-2908